UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:12-CR-067 JD |
| | ) | |
| OMAR DURAN LAGUNES (01) | ) | |
| MARGARITO FUENTES REYES (02) | ) | |
| RAUL RAFAEL ROMAN CAMACHO (03) | ) | |
| LUIS OMAR MONTES MERINO (04) | ) | |
| YALITZA EXCLUSA BORRERO (05) | ) | |
| EVELYN RIVIERA BORRERO (06) | ) | |

**Order**

On December 10, 2012, the government submitted its *Santiago* Proffer, describing much of the evidence that it will present at trial to prove that the conspiracy alleged in the indictment existed, that the defendants were members of the conspiracy, and that various statements made by defendants or non-defendant co-conspirators were in furtherance of the conspiracy. After considering the government's proffer, the Court finds that if the government produces the proffered evidence at trial, it will have satisfied the requirements of the co-conspirator exception to the hearsay rule under Federal Rule of Evidence 801(d)(2)(E), relative to the hearsay statements described herein.

**I. Standard of Review**

The applicable legal standards for the co-conspirator exception are well established. The government must demonstrate, by a preponderance of the evidence, that (1) the conspiracy existed; (2) the defendants and the declarant were both members; and (3) the statement was made in the course of and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999). The contents of the statements themselves may be used to demonstrate the elements of the exception, and the government does not need independent corroborating evidence. *United States v. Brookins*, 52 F.3d 615, 623 (7th Cir.

1995). Moreover, co-conspirator statements are admissible under Rule 801(d)(2)(E) even against conspirators who join the conspiracy after the statements were made, as long as the conspiracy existed at the time. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990).

There are several ways in which the government may proceed to meet its burden, but the favored approach in the Seventh Circuit, and the option employed here, is the so-called "*Santiago* proffer," first approved in *United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir. 1978). This procedure allows a district court to conditionally admit co-conspirator statements based on a pre-trial proffer by the government of the evidence that it will produce at trial that will satisfy the requirements of admission under Rule 801(d)(2)(E). If the government does not live up to its proffer, the defendants can move for a mistrial or to have the statements stricken.

## II. Analysis

The government seeks a conditional ruling admitting four types of co-conspirator statements. First, it intends to produce, by transcript or testimony, statements made by various charged co-conspirators—the defendants—to government agents during undercover transactions. Second, it will produce statements made by the defendants to others in furtherance of the scheme—primarily Bureau of Motor Vehicles employees. Third, it intends to produce statements made by various defendants to customers of the alleged conspiracy who are now cooperating with the government. Finally, the evidence will include some statements made by a conspirator who is not charged in the indictment.

**A.      The proffered facts demonstrate the existence of a conspiracy.**

The first question is whether the proffered evidence would establish by a preponderance of the evidence that a conspiracy existed. The conspiracy at issue is that alleged in the indictment, namely to conceal, harbor, or shield known illegal aliens from detection and to induce or encourage

2

aliens to enter or reside in the United States illegally. The conspiracy allegedly pursued this illegal objective by assisting illegal aliens to obtain vehicle registrations, license plates, and titles for the vehicles, despite Indiana Bureau of Motor Vehicles policies designed to prevent individuals without social security numbers from obtaining these items.

Based on the government's proffer, the Court finds that it has met its burden to demonstrate that an agreement to pursue the alleged scheme existed between Omar Duran Lagunes ("Duran"), Raul Rafael Roman Camacho ("Roman"), Yalitza Exclusa Borrero ("Borrero") and Evelyn Rivera Borrero ("Rivera"), beginning in at least October 2011—though other evidence suggest that Duran's business dates back before 2009—and continuing until June 2012, and that the other co-defendants and one uncharged conspirator ("Mari") were members of this same conspiracy for some or all of that period. The evidence, including documents from the BMV and evidence recovered in 2009 and 2011 searches, will purportedly show that the defendants were involved in submitting hundreds of applications for commercial plates on behalf of undocumented aliens without social security numbers. Specifically, Roman notarized most of the approximately 200 Power of Attorney forms that police received from the BMV, which allowed Borrero and Rivera to present the transactions to the BMV.

The government will also produce evidence that the undocumented aliens who received the commercial plates could not have otherwise obtained vehicle registrations and plates due to BMV policies. The evidence from undercover transactions—the co-conspirator statements themselves—establishes that Borrero and Rivera, along with Margarito Fuentes Reyes ("Fuentes"), and Luis Omar Montes Merino ("Merino"), met with undercover agents posing as illegal aliens at various locations, explained the process by which plates and registrations could be obtained, and filled out paperwork and took payment for services. Recordings and surveillance evidence will also

3

show that Duran was the head of the operation and that Duran, Borrero, and Rivera presented paperwork to the BMV on behalf of the undercover agents.

Having found that the government's proffer would demonstrate by a preponderance of the evidence an agreement to carry out the alleged scheme, the next question is whether the object of that scheme was unlawful. The Court has already concluded that the government could theoretically prove its case by proving that the defendants' agreed objective was to "conceal, harbor, or shield" or "induce or encourage," and that the scheme described above was taken in furtherance of those ends. *See* DE 138. Now, having seen the government's *Santiago* proffer, the question for the Court is whether the evidence cited therein would in fact prove (by a preponderance of the evidence) an agreement to pursue some unlawful end. The Court concludes that it would.

Simply, the government's proffered evidence shows that the defendants engaged in a conspiracy to pursue *at least* one unlawful end: inducing or encouraging illegal aliens to continue residing in the United States.[1] The evidence cited would show that the conspiracy existed to provide services to illegal aliens that those aliens could not otherwise obtain by virtue of the fact that they were illegal aliens. The conduct is clearly sufficient to satisfy the broad test from *United States v. Fujii*, 301 F.3d 535, 540 (7th Cir. 2002), under which the government may prove that a defendant "encouraged or induced" aliens to enter or remain in the country simply by showing that they "knowingly helped or advised the aliens."

Even if the Seventh Circuit would refine the test from *Fujii*—which upheld a conviction for actually escorting illegal aliens into the United States using fraudulent passports—in light of

---

[1] The Court need not, and does not, decide here whether the government would also prove that an objective of the conspiracy was to "conceal, harbor, or shield," or to commit mail-fraud. The Court expresses no opinion on whether the proffered evidence would prove a violation of those provisions. For Rule 801(d)(2)(E), it is enough that there was a conspiracy to commit a crime.

4

developments in the law or the particular facts of this case, the Court finds that the conduct alleged in this case falls soundly within the definition of "encourage or induce" explicitly or implicitly adopted in other circuits. The Third Circuit recently placed limits on the type of conduct that falls within § 1324(a)(1)(A)(iv)'s prohibition on inducing or encouraging, holding that it only prohibits "a person from engaging in an affirmative act that...encourages or induces an alien lacking lawful immigration status to come to, enter, or reside in the United States where the undocumented person otherwise might not have done so." *DelRio-Mocci v. Connolly Properties, Inc.*, 672 F.3d 241, 249 (3rd Cir. 2012) (holding dismissal of civil RICO claims failing to meet this standard). Though not articulating such a standard, other Courts of Appeal have upheld convictions for the type of conduct that would meet the Third Circuit's test. *See United States v. Ndiaye*, 434 F.3d 1270 (11th Cir. 2006) (holding that providing false documentation to enable aliens to obtain social security number amounts to encouraging under the statute); *United States v. Oloyede*, 982 F.2d 133 (4th Cir. 1992) (upholding conviction for selling false citizenship papers: "While offering [aliens] a chance to stand equally with all other American citizens, defendants encouraged them to continue to reside here").

The alleged scheme in this case meets the *Fujii* standard and also follows a similar pattern as convictions upheld in other circuits, and the Court holds that the efforts to assist undocumented aliens to obtain vehicle registrations and license plates—and thus the ability to own and use a motor vehicle—that they would not otherwise be able to obtain *because of their immigration status*, offers those aliens "a chance to stand equally with all other American citizens" in this respect, and "encourage[s] them to continue to reside here." Nor does a holding that the conduct alleged here falls within the statute expand its reach to include innocuous and common conduct to the degree suggested by defendants. This is not a case of someone prosecuted for merely providing routine professional or administrative assistance to aliens. Rather, the objective of the conspiracy was to

5

help (for a fee) illegal aliens circumvent policies and procedures specifically designed to prevent them from obtaining certain benefits by creating bogus companies that had no other purpose than to allow the illegal aliens to secure BMV documentation without otherwise producing a social security number. The conduct here allowed illegal aliens to obtain valid vehicle registrations, license plates, and titles, and thus gave them access to motor vehicles, which are in many cases necessary to live and work in this country. The Court therefore finds that if the government produces the evidence cited in its *Santiago* proffer, it will have demonstrated, by a preponderance of the evidence, that a conspiracy existed—namely an agreement to unlawfully induce or encourage aliens to reside in the United States unlawfully.

**B.      All the defendants and the uncharged individual were members of the conspiracy.**

The Court also finds that the proffered evidence would demonstrate by a preponderance of the evidence that all six defendants in this case, as well as the one uncharged conspirator "Mari," were members of the conspiracy at one point or other. "Once a conspiracy is established, only slight evidence is required to link a defendant to it." *United States v. Shoffner*, 826 F.2d 619, 627 (7th Cir. 1987) (citation omitted). Further, "statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late or join an ongoing concern." *United States v. Potts*, 840 F.2d 368, 372 (7th Cir. 1987).

*Omar Duran Lagnues.* Direct encounters between Duran and undercover agents reveal his active role in the conspiracy and his understanding that its purpose was to obtain benefits for illegal aliens that they could not obtain themselves. Statements to undercover agents by other conspirators demonstrate that he was the leader of the conspiracy and directed its operations.

*Margarito Fuentes Reyes.* Fuentes's dealings with undercover agents in person on several occasions and over the phone demonstrate that he was working with others, including Duran, and

that he knew the purpose of the operation was to secure plates and registrations for illegal aliens who could not otherwise obtain them. Other advice he provided to agents shows that he understood that the ultimate goal was to help illegal aliens drive motor vehicles while avoiding detection as illegal aliens by law enforcement.

*Luis Omar Montes Merino.* Similarly, conversations between undercover agents and Merino reveal that he was aware that he was working with Duran and that he understood that the purpose of the operation was to obtain vehicle registrations and license plates for illegal aliens. Items recovered during a search of Merino's home in May 2011, such as BMV papers, lists of vehicle identification numbers and tax identification numbers, and business cards of Omar Duran, confirm his deep involvement with the conspiracy.

*Raul Rafael Roman Camacho.* The government's evidence will show that Roman was the primary, if not exclusive, notary for hundreds of Power of Attorney forms accompanying applications that other members of the conspiracy submitted to the BMV on behalf of customers. These forms came from a broad geographic area covering central and northern Indiana and spanned over two years. The forms were also notarized for individuals on behalf of suspiciously named companies and in at least one instance, the testimony of an undercover agent will show that Roman falsely notarized her Power of Attorney form outside of the agent's presence. At this point only "slight evidence" is necessary to connect Roman to the conspiracy, and these facts show that Roman was regularly working with the conspiracy over a long period of time and not merely an outsider providing notary services, and, circumstantially, that it is more likely than not that he had some understanding of the scheme and its objectives.[2] *See United States v. Tingle*, 183 F.3d 719, 724 (7th

---

[2]The government has also proffered evidence regarding a statement that Roman made to investigators, and a redacted version of the statement designed to avoid potential *Bruton* issues. This statement confirms that he notarized hundreds of Power of Attorney forms and reveals that he was well aware of the objective of the scheme

7

Cir. 1999) (relevant factors in determining whether a relationship was a conspiracy or a buyer-seller relationship include length of affiliation, established method of payment, standardization of dealing, and level of mutual trust).

*Yalitza Exclusa Borrero.* The proffered evidence would show that, like Fuentes and Merino, Borrero helped customers fill out paperwork necessary for the conspiracy while aware that the purpose of the operation was to secure license plates, registrations, and titles for illegal aliens. Surveillance and other evidence would also show that Borrero was involved in presenting completed paperwork to the BMV in order to obtain the items sought by illegal aliens.

*Evelyn Rivera Borrero.* Like Duran, Fuentes, Merino, and Borrero, Rivera dealt with undercover agents posing as potential customers, explained the services offered by the conspiracy, and assisted them in filling out the necessary paperwork. Also like Borrero, surveillance evidence shows that Rivera was involved in presenting completed applications to the BMV.

*"Mari."* Like five of the six defendants, "Mari" dealt with undercover agents whom she thought were illegal aliens, explained the services offered and their cost, and gathered the information that was necessary to obtain license plates. Mari was indeed a member of the conspiracy and the fact that she was not charged in the indictment is no bar to the co-conspirator statement exception. *See United States v. Ziperstein*, 601 F.2d 281, 294 (7th Cir. 1979) ("[I]t is well established that co-conspirators need not be indicted, and *a fortiori* need not be named, for the

---

and the reason why undocumented aliens would seek out Duran's business and pay for the service rather than going to the BMV themselves. Not all the defendants agree that the redacted statement is admissible, and therefore the Court does not rely on Roman's statement for purposes of this order. Although the Court may generally consider all non-privileged evidence in making preliminary evidentiary determinations such as this, *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996), the circumstances of a *Santiago* proffer are unique in that the Court does not actually take evidence but instead relies on a proffer of the evidence that will be introduced at trial. The Court notes that if the redacted statement is ultimately admitted, it will corroborate the finding that Roman was a member of the conspiracy. Further, should the Court determine at trial that it is necessary to consider the full statements themselves to satisfy the co-conspirator exception, the Court will do so outside the presence of the jury.

exception to be applicable.")

## C. The statements identified were made in furtherance of the conspiracy.

Finally, the Court finds that the government's proffer is sufficient to conditionally establish that the various statements it seeks to admit under Rule 801(d)(2)(E) were made during and in furtherance of the conspiracy outlined above. In determining whether statements were in furtherance of a conspiracy, "[t]he standard to be applied is whether some reasonable basis exists for concluding that the statement furthered the conspiracy." *Shoffner*, 826 F.2d at 628. *See also United States v. Layton*, 720 F.2d 548, 556 (9th Cir. 1983) ("[S]tatements must 'further the common objectives of the conspiracy,' or 'set in motion transactions that [are] an integral part of the [conspiracy].' In short, they must assist the conspirators in achieving their objectives. Although statements designed to induce a listener to join a conspiracy are admissible, mere 'casual admission [s] of culpability to someone [the declarant has] individually decided to trust' are not admissible." (citations omitted)). Under this standard, a statement is admissible as in furtherance of the conspiracy even if it is susceptible to alternate interpretations, and "need not have been exclusively, or even primarily, made to further the conspiracy." *Shoffner*, 826 F.2d at 628.

*Defendants' Statements to Undercover Agents.* As the government points out, many of the statements that the various defendants made to undercover agents were not factual statements but rather instructions or negotiations. For example, defendants' instructions to agents regarding what forms to fill out, what information to provide regarding vehicle purchase prices, whether or not to obtain insurance, where to keep certain documents, or how to explain the corporate registration if stopped by law enforcement are not admitted to prove their truth—they are not factual statements and thus not true or false at all—and therefore they are not hearsay in the first place. *United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996) (holding that an order or request "could not be

9

hearsay, since it made no assertion of fact that could be true or false").

Some statements do contain factual assertions but will not be admitted to prove the truth of those statements and thus are not hearsay. For example, Fuentes' and Merino's assurances to one undercover agent that the services the company provided were legal will not be introduced to prove that the services were in fact legal (the government obviously contends they were not) but simply to show that he made the statement. *United States v. Norwood*, 798 F.2d 1094, 1098 (7th Cir. 1986) (quoting Advisory Committee Note to Fed. R. Evid. 801(c): "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). Descriptions of documents and the nature of services may be admitted not for their truth, but rather for the non-hearsay purpose of providing context for the non-hearsay instructions, or as circumstantial evidence of a the declarant's involvement in the conspiracy. *See United States v. Gaytan*, 649 F.3d 573, 579 (7th Cir. 2011) ("[O]ut-of-court statements are not hearsay if they are offered not for the truth but to put the defendant's statements in context or to make what he said and did in reaction to the informant's statements intelligible to the jury."). Similarly, miscellaneous statements in the course of transactions such as where the defendants are from are unlikely to be introduced for their truth, but rather to provide context for the undercover transactions and perhaps as circumstantial evidence of the declarant's knowledge or intent. There is no need to apply the co-conspirator statement exception to non-hearsay statements.

Some statements made to agents, however, will be offered to prove the truth of the matter asserted: statements, such as Fuentes', that identify Duran as the boss, or that describe the scheme that the conspiracy used to obtain plates and registrations, do go to prove the roles of various defendants in the conspiracy, the location of offices, and the method by which the conspiracy operated. Other statements, such as Rivera's statement that "everyone that comes here doesn't have

10

papers and that's why they can't go to the BMV," may be offered both for the non-hearsay purposes of showing the declarant's knowledge or intent, and also to prove the truth of the matter, that customers sought services from the conspiracy because of their unlawful immigration status. These statements do qualify under the co-conspirator statement exception because they were made in furtherance and in the course of the conspiracy. They helped convince potential customers to purchase the conspiracy's service, instilled confidence in the conspiracy, and helped obtain information necessary to pursue the conspiracy's objectives. *See United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990) (holding that statements designed to maintain trust or to obtain customers' confidence are in furtherance of the conspiracy).

*Statements to BMV Employees.* The government anticipates calling BMV Customer Service Representatives to testify regarding their encounters with members of the conspiracy. The government does not specify what statements by which defendants these witnesses will relate, but it explains that "the conspirators' statements to [BMV employees] were the sort of conversations that occur whenever a person presents documents to a BMV [employee] and contained few, if any, assertions of fact." Statements such as instructions at the time of a transaction are not assertions of fact and thus not hearsay at all. *See Robinzine*, 80 F.3d at 252. Even if some of the statements contain factual assertions identifying members of the conspiracy or explaining its methods, such statements are not hearsay if admitted to provide context for the BMV transaction or as circumstantial evidence that the conspiracy existed, regardless of the truth or falsity of the statements themselves. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994). And if the government should seek to admit such factual statements for their truth, for some reason, they would certainly be in furtherance of the conspiracy, whether it was to obtain the license plates, registrations, or titles that were the object of the conspiracy or to avoid suspicion or detection. *See*

11

*United States v. Manfre*, 368 F.3d 832, 839 (8th Cir. 2004).

Moreover, the Court notes that the government has identified certain written statements on paperwork presented to the BMV that it will seek to admit into evidence. The government rightly notes that these statements will almost certainly not be admitted for the truth of the matter asserted therein, and therefore will not constitute hearsay. *See United States v. Green*, 648 F.3d 569, 580 n.5 (7th Cir. 2011) (noting that it is not hearsay "when records, especially of fraudulent activity, are introduced not to prove the truth of the matters asserted in the records but to show the course of the transaction or scheme, such as the communication of false information"); *United States v. Serrano*, 434 F.3d 1003, 1005 (7th Cir. 2006) (noting that it is not hearsay when "documents are not introduced for the truth of the matters they assert" but rather "for the inferences that may be drawn circumstantially from their existence or from where they are found, regardless of whether the assertions contained therein are true or not."). Since the purpose of the admission of these documents will be to show that the license applications were tendered to the BMV, they do not appear offered to prove the truth of any statements in the applications. To the extent that potentially hearsay statements are contained in business records either of the BMV or the defendants' business, they may be admissible if they meet the requirements of Rule 803(6). Moreover, the government contends that these statements would meet the co-conspirator exception to the extent they are hearsay. The Court agrees. If any of these written statements are, for some reason, hearsay, the Court agrees that they were made in furtherance of the conspiracy because they advance the conspiracy's goal of obtaining license plates, registrations, and titles for customers from the BMV despite the customer's unlawful immigration status and without revealing that status. They would thus be admissible under the co-conspirator exception, but only to the extent that the written statements are statements of the co-conspirators themselves, and not written statements of the conspiracy's

customers, who have not been shown to be members of the conspiracy.

*Defendants' Statements to Cooperating Witnesses.* The government does not identify which cooperating witnesses—customers of the conspiracy other than the undercover agents—will testify or the content of their testimony, but it notes that the defendants' statements to cooperating witnesses are similar to those made to undercover agents. In many cases they are likely instructions regarding what paperwork to fill out, how much to pay, and perhaps how to explain the commercial registration to law enforcement if stopped, and not factual statements, and thus not hearsay at all. *See Robinzine*, 80 F.3d at 252. Again, some factual statements, such as descriptions of documents and the nature of services may be admitted not for their truth, but rather to provide context for the non-hearsay instructions, or as circumstantial evidence of the declarant's involvement in the conspiracy. *See Gaytan*, 649 F.3d at 579. In other cases, statements identifying members of the conspiracy or explaining the manner in which it operated may be admitted for their truth. But such statements furthered the conspiracy because they were directed toward soliciting business for the conspiracy, instilling confidence in customers, or obtaining registrations, plates, and titles for the witnesses. *Guyton*, 36 F.3d at 658; *Sophie*, 900 F.2d at 1073-74.

*Uncharged Conspirator Statements.* Having concluded that "Mari" was a member of the conspiracy, though not charged in this indictment, the Court finds that her statements to undercover agents, to the extent they were hearsay in the first place and not instructions, were made in furtherance of the conspiracy. Specifically, her instructions regarding what kind of ID the agent needed to obtain plates, whether he should buy insurance, and what purchase price to fill in for the vehicle are instructions, not hearsay, and her statements regarding the cost of services, while factual, are offered to provide context to the undercover transaction. If other statements regarding the members or operation of the conspiracy are offered for their truth, they will satisfy the co-

conspirator exception for the reasons discussed above relative to the charged conspirators' statements to undercover agents or cooperating witnesses.

### III. Conclusion

Accordingly, the Court finds that the government has shown by a preponderance of the evidence that the conspiracy described by the government existed, that the six defendants and one uncharged co-conspirator were members of the conspiracy, and that the statements were made during the course of the conspiracy and in furtherance of it. The court makes this preliminary determination pursuant to Rule 104, Federal Rules of Evidence. Following the procedures suggested in *Santiago*, 582 F.2d 1128, the Court will conditionally admit the statements pursuant to Rule 801(d)(2)(E) subject to a final ruling at the close of the government's case once the Court has seen the evidence.

SO ORDERED.

ENTERED: January 8, 2013

/s/ JON E. DEGUILIO
Judge
United States District Court