UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:12-CR-067 JD |
| | ) | |
| OMAR DURAN LAGUNES (01) | ) | |
| MARGARITO FUENTES REYES (02) | ) | |
| LUIS OMAR MONTES MERINO (04) | ) | |
| YALITZA EXCLUSA BORRERO (05) | ) | |
| EVELYN RIVERA BORRERO (06) | ) | |

OPINION AND ORDER

The five defendants were convicted after a joint trial of one count of conspiring to

conceal or shield from detection illegal aliens or to induce or encourage illegal aliens to reside in

the United States, and on one count of conspiring to commit mail fraud in furtherance of that

scheme. The probation office then completed a Presentence Investigation Report (PSR) for each

defendant in preparation for sentencing. Although each PSR differs in certain respects from the

others, there are several common issues that should receive common answers, to eliminate

potential unwarranted disparities between defendants convicted of the same crime.

To facilitate resolution of the common issues, the Court bifurcated the defendants'

sentencing hearings and held the first hearing jointly for all defendants, on July 19, 2013. At the

hearing, the government presented evidence and counsel for each party offered argument on the

various issues in dispute. The government filed a supplemental sentencing memorandum on July

29 [DE 360]; defendant Evelyn Rivera Borrero responded on August 1 [DE 361]; Yalitza

Exclusa Borrero, Margarito Fuentes Reyes, Luis Omar Montes Merino, and Omar Duran

Lagunes responded on August 8 [DE 364, 366, 367, 368]. This order resolves all pending

objections regarding the guideline calculations for each defendant, except for the proposed

obstruction of justice enhancements for Luis Omar Montes Merino and Yalitza Exclusa Borrero, which will be ruled on at the time of sentencing after an additional opportunity to present evidence and argument. Once the Court schedules the respective sentencing hearings, each party will be required to file a sentencing memorandum to include a discussion of the statutory sentencing factors under §3553(a), as well as any other matters pertinent to sentencing.

## I. Background

### A.     Factual Overview

In Indiana, a Social Security Number is a prerequisite to title or register a vehicle and obtain license plates. The BMV enforces this requirement using an online database maintained by the Social Security Administration that allows customer service representatives to check that the name on a title or registration application matches the Social Security Number provided. Since at least 2009, Omar Duran Lagunes was in the business of obtaining these documents for individuals—sometimes, perhaps often, but not necessarily always, illegal aliens— circumventing this requirement by exploiting a "loophole": corporate entities do not have Social Security Numbers and instead verify their identity using an Employer Identification Number (EIN) issued by the Internal Revenue Service. While he advertised that he could obtain licence plates for his customers "100% a su nombre," ("100% in your own name"), Duran's real business was to obtain a title and registration in the name of a Limited Liability Company named "Customer Name, LLC."

There were five basic steps to Duran's business model. First, a customer would fill out an intake form and provide a blank title for the vehicle, a form of identification, an Individual Taxpayer Identification Number (ITIN) (obtained from the Internal Revenue Service), and a signed (and blank) power of attorney form. Second, Duran would take the information provided

and create an LLC in the customer's name at the Indiana Secretary of State website. Third, Duran would apply with the IRS to obtain an EIN for the new LLC. Fourth, Duran or one of his employees would complete the necessary paperwork and present an application for title and registration to the BMV on behalf of the LLC and pay the necessary fees. Finally, the BMV would issue title, registration, and temporary plates at the point of sale and then later mail the permanent plates directly to the customer. Duran and company usually charged $350 to obtain title, registration, and plates. About half of that cost went to fees necessary to create the LLC or register the vehicle; Duran retained the other half.

There has been no evidence that anything about this basic operation is itself illegal, at least when not used for the purpose of concealing or aiding illegal aliens. But Duran's operation also often employed a number of shortcuts and misrepresentations along the way. First, Duran advertised that vehicle titles and plates would be "100% in your name," not in the name of an LLC. Second, as evidenced by conversations between conspirators and undercover agents, customers were reassured that the process was legitimate "because if there were problems it wouldn't be possible to do this process." (Govt. Ex. 22A). Third, in the few examples of transactions before the Court (one real and several undercover), the defendants did not fully explain the details of the scheme even when specifically asked and did not obtain permission to create an LLC or obtain an EIN, nor did defendants advise customers that false vehicle sales amounts and insurance information were to be submitted to the BMV on their behalf. Fourth, while customers sometimes (but not always) did sign a Power of Attorney form, that signature was falsely notarized later and important details (such as the name of the Attorney in Fact) were added. Fifth, the conspiracy actually obtained the titles and registrations by fraud, submitting false information, including fictitious vehicle sales amounts on title documents and false or

fraudulent insurance policy numbers on registration applications.

Duran was assisted by the four convicted defendants and others. Luis Omar Montes
Merino was already involved at the time a search warrant was executed in July 2009 as
documents reveal his involvement well before that. Yalitza Exclusa Borrero testified that she
joined sometime between August 2011 (when she met Duran) and November 2011 (when she
married him). Evelyn Rivera Borrero testified that she began working for Duran in late October
or early November of 2011. And law enforcement agents first encountered Margarito Fuentes
Reyes in February 2012, by which time he claimed to have helped process over 200 applications.

## B.     Presentence Reports

The PSRs calculate the guidelines separately for each defendant, based on his or her
length of involvement and role in the conspiracy, but are based on common factual premises and
legal conclusions. The applicable guideline for the immigration conspiracy conviction under 8
U.S.C. § 1324(a) in Count 1 is § 2L1.1; for the mail fraud conspiracy charge under 18 U.S.C. §
1349, the guideline is § 2X1.1, which in turn cross-references the mail fraud guideline at §
2B1.1. Because the two counts are related and therefore grouped,[1] there is no dispute that the
final guideline range is simply the higher of the guidelines applicable to each count.

The basic calculations are the same for each defendant, given that this was a jointly
undertaken offense and the enhancements applied herein are based on each defendant's own acts

---

[1]The government briefly suggests that the principle of uniting should also apply in this case, pursuant to
guideline § 3D1.4 [DE 360 at 17], without ever referring to the concept of uniting or citing guideline § 3D1.4. But,
the guidelines make clear that uniting comes into play only when you have more than one group. *See* §§ 3D1.1(a),
3D1.4. Here, we only have *one group* consisting of *two counts* under § 3D1.2(c) because the guidelines applicable
to Count One (§2L1.1(b)(2)) and Count Two (§ 2B1.1(b)(2)) both include an increase for a specific offense
characteristic relative to the number of aliens, also determined herein to be the victims of the offense conduct. Even
the indictment specifically charged that Count Two (conspiracy to commit mail fraud) was carried out "in
furtherance of the conspiracy described in Count One [harboring illegal aliens]" and the government has not
provided any basis for rejecting the presentence reports' grouping of the two counts under § 3D1.2.

or of those acts that were reasonably foreseeable acts of other defendants committed in furtherance of the conspiracy and occurring during the commission of the offense, *see* U.S.S.G. 1B1.3(a)(1)(B);[2] although some defendants are responsible for less relevant conduct than others (i.e., smaller loss amount and fewer victims) based on when each defendant became a member of the conspiracy (as detailed hereafter). Under § 2L1.1(a)(3), the base offense level is 12, which the PSR then increases by 9 levels under § 2L1.1(b)(2)(C) on the grounds that the crime involved 100 or more unlawful aliens.[3] Thus, the PSR calculates the adjusted offense level for Count 1 for each defendant as 21, before any adjustments under Chapter Three of the guidelines are applied for role in the conspiracy.

Under § 2B1.1(a)(1), the base offense level is 7. The PSR then calculated the "loss" attributable to each defendant under § 2B1.1(b)(1) by treating each customer as a "victim" and multiplying the total number of customers by the $350 typical cost to each customer. The exact number of customers is unknown, but Secretary of State records reveal that between February

---

[2]The evidence introduced at trial provided ample evidence of an agreement among all of the defendants to operate a business, for profit, that would obtain vehicle titles, registrations, and license plates for customers who, due to their lack of social security numbers, could not obtain those items from the Bureau of Motor Vehicles themselves. Evidence in the form of recorded undercover transactions with each of the five defendants demonstrates that Duran ran the business under several names and at several locations, and that the other defendants assisted him in one capacity or another, by meeting with prospective customers, explaining the operation (at least superficially), answering questions, and helping fill out the necessary paperwork. Common phone numbers, business cards, and business practices recovered from business and residential locations in the Indianapolis area and in Elkhart demonstrate that the locations and the defendants were part of a common business enterprise. The testimony of BMV representatives, as well as documents recovered that could have only been created by the BMV, demonstrate that Yalitza Exclusa Borrero and Evelyn Rivera Borrero, along with Omar Duran Lagunes, presented applications to the BMV on behalf of registered business entities that had been created by the conspiracy (specifically by an individual with an e-mail address containing the name Omar Duran, according to records of the Secretary of State) for Duran's customers. This same evidence provides numerous examples of foreseeable acts committed in furtherance of and during the commission of the conspiracy to help known illegal aliens (based on representations undercover agents made to defendants) to obtain benefits that they could not otherwise legally obtain without a valid social security number.

[3]Because the Court ultimately relies on the higher guidelines calculation for Count 2 under § 2B1.1, it does not address the PSRs' conclusion that the crime involved 100 or more unlawful aliens.

15, 2010, and June 15, 2012, Duran created 1682 LLCs—by the PSRs' calculations, approximately 62 per month for 27 months. Records recovered from computers seized during searches suggest a similar or faster pace of business between January and October 2010. Based on an estimate of 62 customers per month, the PSRs for Duran and Merino assign a total loss of $933,100, based on 2,666 customers over the 43 months between January 2009 and July 2012, inclusive and a 14-level increase under § 2B1.1(b)(1)(H); the PSR for Fuentes Reyes assigns him a total loss of $217,000 (based on 620 customers over 10 months' involvement between May 2011 and February 2012, inclusive) and a 12-level increase under § 2B1.1(b)(1)(G); the PSRs for Yalitza Exclusa Borrero and Evelyn Rivera Borrero assign each a total loss of $195,300 (based on 558 customers over 9 months' involvement between October 2011 and June 2012, inclusive) and a 10-level increase under § 2B1.1(b)(1)(F).[4]

Each defendant also received a 6-level enhancement under § 2B1.1(b)(2)(C) for more than 250 victims, a 2-level increase under § 2B1.1(b)(10) because the conspiracy involved "sophisticated means," a 2-level adjustment under § 2B1.1(b)(11)(C) because the offense involved using one means of identification (name or address) to obtain another means of identification (car title/registration), and a 2-level vulnerable victim enhancement under § 3A1.1(b)(2) because the victims were targeted as illegal aliens. Thus, Fuentes Reyes' PSR calculated his offense level at 31, and Rivera Borrero's at 29. Duran received a 4-level enhancement under § 3B1.1(a) for his role as organizer and leader of the conspiracy, for a total

[4]As discussed in the analysis below several of the basic mathematical calculations in the PSR are erroneous, even if theoretically sound. First, February 15, 2010 to June 15, 2012, spans a period of 28, rather than 27 months, reducing the average number of LLCs per month from 62 to 60 (1682 ÷ 28 = 60). Second, the conspiracy ended with the arrest of the defendants in June, not July 2012, making the total period of the conspiracy given the dates in question actually 42, rather than 43 months. In addition, the number of months assigned to Fuentes Reyes, Exclusa Borrero, and Rivera Borrero are incorrectly calculated. The proper numbers will be discussed and applied in the final calculation below.

offense level of 37. Merino and Exclusa Borrero received 2-level enhancements for obstruction of justice under § 3C1.1, based on their materially false trial testimony, resulting in total offense levels of 35 and 31, respectively.

## II. Analysis

The defendants object to much of the PSRs' guideline calculations. They all object to enhancements based on loss calculations, the number of victims, sophisticated means, means of identification, and vulnerable victims. For its part, the government defends the PSRs calculations and argues that if the defendants' objections to the mail fraud guideline calculation result in a significantly lower offense level, the Court should consider an upward departure on the immigration guideline to account for the large number of illegal aliens involved in the offense. The Court addresses each issue in turn.

### A.       Loss Amount

"Loss" under § 2B1.1(b)(1) means "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, application note 3(A). Actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense, and intended loss means "the pecuniary harm that was intended to result from the offense." *Id.* application note 3(A)(i), (ii). "When the guidelines speak of 'intended loss,' the relevant inquiry is not 'How much would the defendants probably have gotten away with?', but, rather, 'How many dollars did the culprits' scheme put at risk?'" *United States v. Bonanno*, 146 F.3d 502, 509–10 (7th Cir. 1998). "Resulted from" the offense means "but for" causation, but it still must be "reasonably foreseeable." U.S.S.G. § 2B1.1, application note 3(A)(iv). An important caveat is that all loss must be "pecuniary harm," which means "harm that is monetary or that otherwise is readily measurable in money"—it does not include non-economic harm. *Id.* application note 3(A)(iii). When calculating financial losses, relevant

conduct is limited to relevant *unlawful* conduct. *United States v. Schaefer*, 291 F.3d 932, 939–40 (7th Cir. 2002).

The government must prove its loss estimate is within a particular guideline range by a preponderance of the evidence using reliable and specific evidence. *United States v. Hatchett*, 31 F.3d 1411, 1418 (7th Cir. 1994). However, "the court need only make a reasonable estimate of loss. . . . [T]he court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, application note 3(C); *United States v. Ross*, 77 F.3d 1525, 1552 (7th Cir. 1996). The Application Note gives examples of what factors to consider, such as "the fair market value of the property taken," "[t]he approximate number of victims multiplied by the average loss to each victim," and "more general factors, such as the scope and duration of the offense and revenues generated by similar operations." U.S.S.G. § 2B1.1, application note 3(C). Generally speaking, "loss" means *net* loss, which means that any thing of value given to the victim must be credited against the loss. *Id.* application note 3(E)(i); *United States v. Hausmann*, 345 F.3d 952, 960 (7th Cir. 2003). Finally, the "gain" that resulted from the offense may be used as an alternative measure of "loss," if (1) there is a loss but (2) it reasonably cannot be determined. U.S.S.G. § 2B1.1, application note 3(B); *see United States v. Craig*, 178 F.3d 891, 899 (7th Cir. 1999) ("While the Sentencing Guidelines permit courts to look to a defendant's gain as a basis for calculating loss, courts should do so when the exact amount of the loss to the victim is unknown.").

  i.  *Tax Loss*

Much of the defendants' arguments attack the potential of using an estimate of the sales tax loss to the State of Indiana caused by falsely reported vehicle values. This method—discussed but not adopted in the PSR—compares the taxes paid on vehicles reported to

have been sold for $100 or $200 with the Kelly Blue Book value for private sales of those vehicles, resulting in an extrapolated tax loss of $467,511.28 over the course of the conspiracy. The defendants object that this calculation is too speculative: it does not account for the wide variety of vehicle conditions and sales amounts in private transactions and, more importantly, does not reflect the fact that many of the title transfers affected by the conspiracy were made without consideration from the name of a third-party to the LLC. The government does not press this loss amount calculation, agreeing that it is too speculative. The Court agrees: although it appears clear (and defendants concede) from the evidence that there was *some* tax loss to the State, there is no reasonable way to determine the amount of that loss. Therefore, the Court will not take any purported "tax loss" into consideration in calculating the appropriate loss amount in this case.

ii.     *Loss to Customers*

The government argues in favor of the loss amounts adopted by the PSRs. Those calculations (as noted above) are based on the assumption that every customer was a victim of the mail fraud conspiracy and on the view that the $350 typically paid by each customer represents that victim's loss—a total of $933,100.00 over the whole course of the conspiracy.[5] The government's theory (adopted by the PSRs) is that all customers in this case are victims of the mail fraud scheme because they were promised titles and registrations 100% percent in their names, but instead received titles and registrations in the name of a similarly-named LLC.

---

[5]At the hearing, the government explained the basis for this calculation differently, characterizing $350 per customer as the *gain* to the conspiracy under application note 3(B)—though in a sentencing brief filed before the hearing, the government also characterized the $350 as the loss suffered by each customer. "Gain" and "loss" are entirely different concepts in the guidelines, however, and the gain to the defendants would not be a proper measure of loss if (as appears to be the government's argument) it is possible to reasonably determine the loss to the victims. Moreover, it would not make any sense to include the amounts paid to the BMV in calculating the amount gained by the defendants.

9

According to the government, there are several consequences to this. Most simply, the customers did not "get what they paid for." Beyond that, the process by which the defendants obtained titles, registrations, and plates raises a series of risks for the customers that they did not bargain for. First, an LLC that does not meet its biennial filing requirements may be administratively dissolved by the Secretary of State, which could jeopardize the validity of the title and registration and make subsequent renewals impossible. Second, the fact that the vehicle is titled in the name of an LLC could make it difficult for customers to resell their vehicles. Finally, unbeknownst to their customers, the defendants fraudulently obtained the registrations by using fictitious insurance policy numbers, which raises questions of voidability and calls into doubt the value of the registrations obtained.

The defendants respond that the customers are not victims because they "got what they paid for." They were promised plates in their own names and the registrations obtained did contain their names. Further, despite the government's arguments regarding the risk that the LLCs might be administratively dissolved, or the registrations voided due to fraud, there is no evidence that either of these things has actually happened. Finally, the defendants point out that the purpose of the scheme alleged in the indictment was to *help* illegal aliens, not to victimize them.

The Court agrees with the government that the money paid by the conspiracy's customers is properly considered the loss amount in this case. The customers paid for something (legally obtained license plates in their own names) and got something quite different (a business entity created without their authorization and fraudulently obtained license plates in the name of that business entity). The problem with this is more than a simple technicality of an extra three letters on a title or registration form. It created an administrative burden for customers that they did not

anticipate, such as the need to file appropriate bi-annual reports and records for the corporate entity,[6] and, indeed, were generally unaware of. Moreover, the fraud involved in obtaining the registrations raises the possibility of suspension of those registrations (or worse) and calls into question the value of the registrations themselves.

In addition, the Court finds that this was more likely than not the case in every transaction, based on the evidence presented. In none of the examples before the Court did the defendants explain the process they would use to the customer or obtain the customer's authorization to create an LLC in the customer's name or obtain an EIN on the customer's behalf. Rudiments of the process were divulged to those undercover agents who asked questions only *after* receiving BMV documents with "LLC" tacked onto the end of their names, and the testimony of actual customer Jamie Tabora was that he was never told about the creation of an LLC. Further, the defendants did not ask customers for insurance information, either verbally or on the intake forms; when an undercover agent inquired about the need for insurance, he was told that "it's not necessary." This evidence of the standard method of operation is sufficient to demonstrate, by a preponderance of the evidence, that the conspiracy did not obtain authorization to create essentially shell LLCs and use fictitious insurance policy numbers as a matter of course.

The defendants are correct that there is no evidence that an LLC has actually been dissolved or any registration suspended or revoked. It may also be true, as the defendants note, that some customers were perfectly content with the services they received, despite there being no evidence of that. In any event, this misapprehends the nature of the loss in this case. As

_____

[6]*See e.g.,* Indiana Secretary of State Business Services Division, An Entrepreneur's Guide to Starting a Business in Indiana, http://www.in.gov/sos/business/2428.htm (last visited September 16, 2013).

discussed above, the defendants defrauded their customers by promising them one thing and delivering something else. Customers (and ultimately victims) arrived at what appeared to be legitimate businesses operating in the open and held out to the public by way of advertisements (via the radio, newspaper ads, and storefront signs) as providing legal means by which one could obtain BMV titles, registrations, and plates in the customer's own name. But defendants failed to provide customers with material details of how titles and plates were obtained. Moreover, in some cases, at least, the defendants assured their customers that the process was legal and that "otherwise it wouldn't be possible to do this process." The defendants cannot now argue that there was no loss to customers because they would have purchased the defendants' services anyway. As the Seventh Circuit has explained, "[w]hen imposing sentence a judge may assume that funds that were furnished only because of material deceit would not otherwise have been forthcoming." *United States v. Frost*, 281 F.3d 654, 659-60 (7th Cir. 2002). Even if some customers may have later acquiesced to the fraudulent services provided (and there is no evidence that they willingly did) does not change the fact that the defendants defrauded their customers through means of material misrepresentations and omissions to obtain their business.

   iii.    *Credits Against Loss*

The remaining question is whether the loss amount should be $350 per customer, as the government argues, or whether cost of the registration and plate (which the customer did receive) should be credited, resulting in an estimated loss amount of $180 per customer. The general rule for loss calculations is that "[l]oss shall be reduced by . . . the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, application note 3(E)(i). The government contends, however, that the loss to each customer is $350,

12

including the amount paid for the title, registration, and licence plate received, under the special rule of application note 3(F)(v)(III), which states that if the case involves "goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud," then "loss shall include the amount paid for the property, services, or goods transferred, rendered, or misrepresented, with no credit for the value of those items or services." The defendants contend that this application note does not apply in this case because the items obtained were not "goods" but rather intangible licenses.

The Court notes that the Ninth Circuit has held that application note 3(F)(v)(III) applies only to "tangible personal property." *See United States v. Crandall*, 525 F.3d 907, 913 (9th Cir. 2008) (overturning use of application note 3(F)(v)(III) in the context of real property subject to regulatory classification as condominiums rather than apartments). The Fifth Circuit, on the other hand, had no difficulty applying application note 3(F)(v)(III) to intangible personal property. *See United States v. McLemore*, 200 F. App'x 342, 344 (5th Cir. 2006) (unpublished opinion) (no setoff for the value of a Medicare provider number obtained by fraud).

The Court holds that application note 3(F)(v)(III) applies to intangible personal property as well as tangible personal property and therefore that the appropriate measure of intended loss includes the fees paid to create the LLC and to title, register, and plate the vehicles. Although the Ninth Circuit narrowly defined "goods" to include only "tangible personal property," the focus of *Crandall* was not on whether the property in question was tangible or intangible, but rather whether it was personal or real property. 525 F.3d at 913. That case involved the fraudulent conversion of apartment buildings to condominiums, without the necessary regulatory approval. *Id.* at 909–10. The district court applied the special rule for fraudulent regulatory approval. *Id.* at 911. The Ninth Circuit reversed, based on the above-quoted definition of goods (which it took

from Black's Law Dictionary), noting that "the fraud in this case involved real property, not personal property." *Id.* at 913. Notably, the court did not specifically consider whether the application note was appropriate for personal property like the LLCs, titles, license plates, and registrations in this case.

There might be a reason to treat real property differently than personal property: The difference between an apartment building that has been fraudulently converted into condominiums is that the real property still retains significant value even absent the regulatory "upgrade." It would be strange to conclude that an apartment building has no value merely because it is now a condominium. The appropriate loss in that case is the difference between the value of the real property as apartments and its value as condominiums.

But that same rationale does not serve to distinguish intangible (Medicare provider numbers) from tangible personal property (prescription drugs). The commentary to Amendment 617, which instituted the special rule of application note 3(F)(v)(III), explained that the rule was intended to "reflect the importance of the regulatory approval process to public health, safety, and confidence." *See* U.S.S.G. app C, Vol. II at 180. Thus, it refuses to recognize the value of the item only insofar as it has been legitimately approved by the regulatory agency. A prescription drug that has not been properly approved as safe for use is therefore presumed valueless and a Medicare provider number that has been obtained by fraud is presumed valueless to the healthcare provider. Likewise, the Court concludes that whatever value a vehicle registration obtained pursuant to fraudulent misrepresentations has, that value should not be credited against the loss amount.

Moreover, the Court would note that the Seventh Circuit recently discussed tangible versus intangible property in the context of determining what constitutes a means of

identification. *See United States v. Spears*, No. 11-1683, 2013 WL 4774514 (7th Cir. Sept. 6,

2013). Therein, the Court or Appeals indicated that a means of identification "includes physical

objects," such as a passport, driver's license, firearm-owner card, or other document containing

personal information. *Id*. at *1. Accordingly, this distinction serves as a separate basis to reject

defendants' argument that vehicle titles and registrations are intangible property rather than

tangible goods subject to the guidelines reach.

Duran also argues that credit must also be given for the fair-market value of the *services*

rendered by the defendants in this case, which are clearly not "goods" subject to application note

3(F)(v)(III). Nor do they fall within Application Note 3(F)(v)(I), which applies only to services

fraudulently rendered by someone falsely posing as a licensed professional. But the fact that the

application note does not apply to these services does not mean the defendants are entitled to a

credit against the loss amount: it would be illogical to conclude that the goods provided are

worthless, for guidelines purposes (as the Court does above), and yet conclude that there is a

cognizable "fair market value" to the "service" of obtaining that worthless property. Therefore,

the loss amount for each defendant will be measured by multiplying $350 by the average number

of customers per month over the course of that defendant's involvement in the conspiracy.[7]

## B.    Number of Victims

Relevant here, a "victim" means "any person who sustained any part of the actual loss

determined under subsection (b)(1)." U.S.S.G. § 2B1.1, application note 1. Further, "in cases

involving means of identification," victim also means "any individual whose means of

identification was used unlawfully or without authority." *Id.* application note 4(E). "Means of

---

[7]The Court notes that based on the calculations discussed below, a loss amount of only $180 per customer would not affect Duran or Merino's offense level.

15

identification" is defined as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . employer or taxpayer identification number." *Id.* application note 1 (cross-referencing definition in 18 U.S.C. § 1028(d)(7).

The customers in this case are victims under either of these definitions. First, having determined above that the conspiracy defrauded each of its customers, and that under the guidelines the customers suffered a loss in the amount they paid the defendants for fraudulent services, titles, and registrations, it follows that each customer sustained part of the actual loss caused in this case. Second, as noted above, the evidence shows that the defendants did not obtain permission from the customers to use their individual taxpayer identification number to create an LLC and employer identification number. The customers' means of identification were therefore used both unlawfully and without authority, qualifying them as victims under the special rule of application note 4(E).

How many customers did the defendant's defraud? Records from the Indiana Secretary of State show that between February 15, 2010 and June 15, 2012, (a period of 28 months, not 27 as indicated in the PSR), Duran created 1682 LLCs—an average of approximately 60 LLCs per month. The defendants object that extrapolating by using an average of 60 customers per month does not account for the fact that Duran's business started small and grew over time. However, as noted in the background above, files recovered from computers during searches showed that Duran had created 314 LLCs in the five-and-a-half month period between late January and early July 2009, or approximately 57 per month, and 1,280 LLCs over the approximately 15 months between July 2009 and October 2010, or approximately 85 per month. This suggests that 60 customers per month is a reasonable—if not conservative—estimate over the life of the

conspiracy.[8]

Using 60 victims per month over the entire course of the conspiracy (January 2009 until June 2012, or 42 months, not 43 as indicated in the PSR) yields a total victim count of 2,520 for Duran and Merino, and proportionally fewer for the other defendants—the exact number will be calculated below.

## C.    Sophisticated Means

"For purposes of subsection (b)(10)(C), 'sophisticated means' contemplates especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1, application note 8(B). Case law suggests that "sophisticated means" requires something more complex than an ordinary fraud case. *See United States v. Fife*, 471 F.3d 750, 753 (7th Cir. 2006) (defendant used corporate shells to hide ill-gained money and then did not pay taxes on the money); *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) ("The sophisticated means enhancement does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual tax evasion case."). In addition, a defendant need not have personally engaged in sophisticated means, "so long as the use of sophisticated means by other criminal associates was reasonably

---

[8]It is conservative in light of other evidence of significantly higher volume during some periods. For example, Government Exhibit 110A (an estimate of tax loss based on false vehicle sales amounts) lists 137 title transactions at a single BMV branch over a six week period in December 2011 and January 2012—approximately 92 customers per month.

foreseeable to the defendant." *United States v. Bishop-Oyedepo*, 480 Fed. Appx. 431, 433–34 (7th Cir. 2012) (collecting cases supporting enhancement for reasonably foreseeable sophisticated means).

The Court has little difficulty determining that the defendants' scheme, which involved false advertising, the creation of thousands of business entities, false notarizations, fictitious insurance information, false vehicle sales amounts, and intimate knowledge of BMV procedures and loopholes, qualifies as more complex than the ordinary fraud case and one displaying a greater level of planning than the ordinary case. Even if there is no evidence that all defendants had a direct hand in each of the sophisticated characteristics of the scheme, each defendant not only could reasonably foresee but had actual knowledge of the sophisticated operation of the scheme.

**D.      Means of Identification**

Guidelines § 2B1.1(b)(11) provides a two-level enhancement for crimes involving some form of identity theft. Relevant here, § 2B1.1(b)(11)(C) provides an enhancement if the offense involved "(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification." As noted above, means of identification is defined as any name or number that can be used to identify an individual, and specifically includes a name, an individual taxpayer identification number, or an employer identification number.

Application note 9(C)(ii) gives examples of conduct to clarify how this enhancement applies. When a defendant obtains an individual's name and address or social security number from a source (*e.g.* from a piece of mail taken from the individual's mailbox or a driver's license

18

in a stolen wallet) and obtains a bank loan or a credit card in that individual's name, the bank account number or the credit card are the "other means of identification" that have been obtained unlawfully. There is a clear parallel in this case, where the defendants used their customers' names and addresses without the customers' consent to create LLCs and employer identification numbers associated with the customers.

The defendants object by arguing that the customers voluntarily provided their taxpayer identification numbers and that the other means of identification (whether the LLCs, the EINs, or the registrations) were created lawfully. Although means of identification were not stolen from the customers, the evidence in this case suggests that they were used to create business entities and employer identification numbers in customers' names without their authorization or knowledge.[9] As noted above, none of the undercover agents were told about the creation of an LLC and EIN until they received registration documents and asked what the "LLC" appended to their names meant. Jamie Tabora also testified that he was never informed about the creation of an LLC. The defendants' argument would seemingly exempt *any* use of an individual's means of identification, regardless of authorization or knowledge, so long as a victim voluntarily supplied identifying information in the first place. The Court does not agree: a two level enhancement is appropriate where the *use* of the initial means of identification to produce or obtain an additional means of identification is unauthorized.

---

[9]The government contends that even if permission were given, the defendants did not have "lawful authority," as that phrase has been interpreted in aggravated identity theft, 18 U.S.C. § 1028A, to use customers' means of identification in the manner that they did. The Court does not follow this argument. Even if the concept of "lawful authority" applies to the guidelines (the phrase appears nowhere in the text or application note) the customers presumably could have lawfully authorized the defendants to create LLCs and obtain EINs on their behalf. *See e.g. United States v. Spears*, No. 11-1683, 2013 WL 4774514 (7th Cir. Sept. 6, 2013) (holding that a violation of § 1028A requires the use of a means of identification of a person "who did not consent to the use"). In any event, the evidence shows that customers did *not* authorize or consent to such use of their information—rather customers believed they were getting legitimate BMV documents in their own names (not that of LLCs) via legitimate means—so it is unnecessary to address the point further.

Duran argues that the background commentary following U.S.S.G. § 2B1.1 states that subsection (b)(11)(C) "focuses principally on the aggravated form of identity theft known as 'affirmative identity theft'" and that the 2-level enhancement should not apply because there was no actual identity theft in this case. The Court agrees that aggravated identity theft was the driving force behind this guideline, but does not agree that this means that it does not apply to other offense conduct that falls within the plain language of the text but that does not constitute "identity theft" strictly speaking. The guideline provision does not create an enhancement for "aggravated identity theft," which the defendants may not have done, but rather for the unauthorized use of a means of identification to unlawfully produce another means of identification, which they did. And importantly, the background commentary to U.S.S.G. § 2B1.1 speaks to more than just affirmative identity theft, but includes instances where "the victim does not become aware of the offense until certain harms have already occurred"—such as here, where the customers of Duran's businesses were not aware that their identities had been used to set up corporate entities with their own tax identification number. In addition, the guideline enhancement is meant to account for even "non-monetary harms" associated with these type of identity fraud offenses, such as "inconvenience[] and other difficulties resulting from the offense" which may be difficult or impossible to quantify. As previously identified, such harms exist here, including the customers' need to file appropriate bi-annual reports and records for the corporate entities created by defendants which were directly associated with the customers' identifying information.[10] In addition, the defendants' actions jeopardized the validity of the

_____

[10]Defendants specifically argue that the LLCs created by them were in fact legitimate companies; but even considering the shell-like nature of the companies, the enhancement would still apply. *See e.g., United States v. Oates*, 427 F.3d 1086, 1090 (8th Cir. 2005) (finding that even though the credit card account had the name of a fictitious business, the card was connected to identifying information of the victim and therefore the means of identification enhancement applied).

titles and registrations (and caused their likely voidability) and defendants made subsequent renewals or resale of the vehicles difficult. Therefore, the means of identification enhancement is applicable based on the unauthorized use of customers' names and taxpayer identification numbers, or on the possession of more than five means of identification that had been produced unlawfully.

## E. Vulnerable Victims

Guidelines section 3A1.1(b) provides an enhancement of 2 levels for a vulnerable victim[11] if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." A vulnerable victim is: "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, application note 2. A vulnerable victim enhancement also does not apply "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." U.S.S.G. § 3A1.1, application note 2.

Several courts, including the Seventh Circuit, have considered the application of vulnerable victim status to undocumented aliens. These decisions teach that the enhancement does not automatically apply, but may if undocumented aliens are unusually vulnerable in comparison to the typical victims of a particular offense. For example, in *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) the Seventh Circuit reversed the failure to apply a

---

[11]Guidelines section 3A1.1(b) also provides an additional enhancement of 2 levels for a large number of vulnerable victims. When the underlying offense is mail fraud, however, U.S.S.G. § 2B1.1, application note 4(D) specifically states that if the guidelines are enhanced for more than 50 (or more than 250) victims under § 2B1.1(b)(2)(B) or (C), the extra 2-level enhancement under 3A1.1(b)(2) for multiple vulnerable victims shall not apply. Although the government initially objected to the PSR and sought the additional 2-level enhancement for a large number of vulnerable victims, it has since withdrawn that objection in light of the plain language of application note 4(D).

vulnerable victim enhancement in a forced labor case. The Court clearly stated its position that "where vulnerability is not already accounted for in the Guidelines, we will apply the vulnerable-victim enhancement when the victim is a member of a group typically vulnerable to the particular manifestation of the general offense committed by the defendant, whether or not the victim is otherwise unusually vulnerable." *Id.* at 717. Noting that the victim "was a member of a group typically targeted by those desiring forced labor, but her group (illegal aliens) is only part of a broader set of possible victims," the Court found the illegal alien victim vulnerable for purposes of U.S.S.G. § 3A1.1(b)(1). *Id.*

Following a similar rule, in *United States v. De Oliveira*, 623 F.3d 592 (8th Cir. 2010), the Eight Circuit refused to apply the vulnerable victim enhancement in a sentencing for harboring, concealing, or shielding from detection illegal aliens, because "the workers' immigration status was already factored into the offense guideline contained in Section 2L1.1" and "the victims of the crime of harboring illegal aliens are, by definition, illegal aliens, and as such, the worker's immigration status does not distinguish them from other potential victims of the crime." *Id.* 598–99. *But see United States v. Monsalve*, 342 Fed. Appx. 451, 457–58 (11th Cir. 2009) ("The victims [here] were vulnerable not because of being illegal aliens per se, but because they had no identity papers, and thus would be unlikely to report criminal conduct to the police, . . .  making them vulnerable to pressure to engage in criminal conduct.").

In this case, the government suggests that most (if not all) of the conspiracy's customers were illegal aliens.  But while the lack of a Social Security Number may *suggest* a lack of lawful status, it certainly does not prove it in any individual case because many aliens lack a Social Security Number but have legal status. The government did call Jamie Tabora, who testified that he was an unlawful alien at the time he did business with the conspiracy.  And under *Calimlim* it

is Tabora's membership in a vulnerable group that matters. In addition, given the large number of customers that the defendants helped, and the fact that the defendants demonstrated no reluctance to help undercover agents claiming to be illegal aliens, it seems more likely than not that some, perhaps many, other customers were also illegal aliens—a conclusion the jury must have reached in finding the Defendants guilty of Count 1.

In addition, there is no doubt that Defendants "knew or should have known" of the victims' vulnerable status, especially where evidence showed that Defendants Duran and Montes Merino were present when Defendant Evelyn Rivera Borrero explained to undercover Agent Trevino that "Everyone that comes here doesn't have papers because they can't go to the BMV"; where Defendant Margarito Fuentes Reyes was present when undercover Officer Contreras pretended to be an illegal alien unable to go to the BMV to obtain documents; and, where Defendant Exclusa Borrero was intimately involved with the customer intake and the actual delivery and processing of application paperwork at the BMV with sticky notes attached containing insurance information, and she was responsible for taking completed transactions from the BMV back to Omar Duran.

Having the knowledge that at least some of the customers were illegal aliens, the defendants purposefully did not explain to them the process by which the BMV documents would be fraudulently obtained (by the creation of shell LLCs and the use of false insurance and fake notaries), thereby allowing Duran to continually advertise publically and grow his business. In addition, the customers' lack of legal status provided a strong disincentive for them to complain to authorities that they had been victims of crimes. The customers were also much less likely to risk bringing themselves to the attention of immigration officials by going to the police to complain that they did not get what they had been promised. Under the holding of *Calimlim*,

the victims in this case were vulnerable victims for purposes of U.S.S.G. § 3A1.1(b)(1) and the enhancement properly applies.

### III. Conclusion

Having resolved the parties' objections to the PSRs (with the exception of any enhancement for obstruction of justice),[12] the Court now calculates each defendant's offense level.

*i.  Omar Duran Lagunes*

The base offense level under U.S.S.G. § 2B1.1(a)(1) is 7, because mail fraud has a statutory maximum penalty of 20 years. As noted already, Duran was the leader and organizer of the conspiracy and involved from the beginning and throughout the entire 42 months of the conspiracy. This makes him responsible for 2,520 customers. Using an estimated loss of $350 per customer, Duran is responsible for a loss amount of $882,000, resulting in a 14-level increase under subsection (b)(1). The number of victims exceeded 250, resulting in an additional 6-level

_____

[12]The government also objects to the guideline calculations for Count 1 under section 2L1.1, arguing that under § 2L1.1(b)(2), an upward departure to the guideline level should apply based on the large number of illegal aliens involved in the offense [DE 360 at 14-16], which would ultimately result in an increase in the combined offense level of Counts One and Two if "the offense levels for count one and count two end up nine or less levels apart" [DE 360 at 17]. The first argument concerns application note 3(C) of § 2L1.1, while the second argument seemingly addresses the concept of uniting (without any reference to guideline § 3D1.4). Yet, both arguments miss the mark. First, application note 3(C) of § 2L1.1, which states that an upward departure may be warranted if the offense involved substantially more than 100 aliens, does not result in a "departure" to the guidelines, which have been rendered obsolete, *see United States v. Townsend*, 724 F.3d 749 (7th Cir. 2013), rather, the Court would consider the large number of aliens as an aggravating factor for purposes of varying above the guideline range under § 3553(a) if the government can show they were "unlawful aliens". *See United States v. Castillo*, 695 F.3d 672 (7th Cir. 2012) (imposing a sentence 30% above the guideline range to account for 28% times the number of fraudulent documents that triggered the highest guideline sentence under §2L2.1(b)(2)). Second, the government has supplied no reason to reject the presentence reports' grouping of the counts, *see supra* footnote 1, and because the adjusted offense level is higher in each case when the guidelines are calculated under section 2B1.1 than under § 2L1.1, even with the full extent of the enhancement to the guidelines is requested, the Court need not resolve that issue. But even if the Court considered uniting the 2 counts in accordance with guideline § 3D1.4, there would be no increase in the defendants' combined offense level because 9 or more levels would separate the offenses where the government has not shown by a preponderance of the evidence that all of the customers were actually unlawful aliens to support the additional enhancement under § 2L1.1(b)(2).

increase under subsection (b)(2). Two levels each are added for sophisticated means, (b)(1), and the unauthorized use of a means of identification, (b)(11)(C). Two more levels are then added for the vulnerable victim enhancement, under section 3A1.1(b)(1). Finally, 4 levels are added under section 3B1.1(a) because Duran was an organizer or leader and the criminal activity involved five or more participants. His total offense level is thus 37.

ii.     *Margarito Fuentes Reyes*

Again, the base offense level under section 2B1.1(a)(1) is 7. Although the PSR holds Fuentes Reyes responsible for 9 months involvement (May 2011 to February 2012), this is unsupported by the record. Law enforcement first encountered Fuentes in late February, and he was arrested in late June, a total of only 4 months, or 240 customers. During the February undercover transaction, however, he admitted to having already helped approximately 200 customers. Adding these numbers gives 440 customers, for a total loss amount of $154,000. Thus a 10-level increase is appropriate under 2B1.1(b)(1), and a 6-level increase under (b)(2) for the number of victims. The same 6-levels discussed above are then added for sophisticated means, unauthorized use of a means of authorization, and vulnerable victim. His total offense level is thus 29.

iii.     *Luis Omar Montes Merino*

Merino, like Duran, was involved in the offense from the beginning and therefore his guidelines calculation is similar.  However, Merino's counsel argues that he should not be held accountable to the same degree as Duran because he played a much smaller role and was unaware of the fraud because Duran kept the books, set up the bank accounts and LLCs, went to the BMV, advertised, paid the bills, and rented the offices.  Thus, counsel argues that Merino deserves a 2 to 4 level reduction pursuant to guideline section 3B1.3.   The Court disagrees and

notes that under U.S.S.G. § 1B1.3(a)(1)(B), a defendant may be held responsible for relevant conduct that includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."

Section 3B1.2 contains "a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2 application note 3(A). The guideline states:

> (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
> In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2. A defendant must prove his entitlement to a role reduction by a preponderance of the evidence. *United States v. Saenz*, 623 F.3d 461, 466-67 (7th Cir. 2010). The four-level "minimal" participant reduction "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 application note 4. Whereas, a "minor" participant is one "who is less culpable than most other participants, but whose role could not be described as minimal." *Id*. application note 5. The mitigating role determination requires the court to weigh "the totality of the circumstances" and is "heavily dependent on the facts of the particular case." *Id*. application note 3(C). The court looks at the defendant's role in the offense against those of average participants, U.S.S.G. § 3B1.2 application notes 3-5, including the defendant's role in the conspiracy as a whole—the length of his involvement in it, his relationship with the other participants, his potential financial gain, and his knowledge of the conspiracy. *Id*. application note 3(C); *United States v. Diaz-Rios*, 706 F.3d 795, 799 (7th Cir. 2013).

Merino argues that he should receive a mitigating role since his "role is less than

Duran['s]" [DE 367 at 2]. Yet, the argument is misguided. Duran has received a four level enhancement pursuant to guideline section 3B1.1(a) because he was the organizer or leader of the conspiracy, and the Seventh Circuit has made clear that a defendant's "role should be compared to that of the average member of the conspiracy, not with the leaders." *Saenz*, 623 F.3d at 468 (citations omitted). Thus, when viewing Merino's role compared to the average participant, it is clear that no mitigating role reduction is appropriate.

For instance, Merino, like the other average participants (that is, Margarito Fuentes Reyes, Yalitza Exclusa Borrero, and Evelyn Rivera Borrero) was an employee of Duran's business who assisted with the intake of customer information. And while he may not have personally gone to the BMV to subsequently process the documents, he was present during undercover operations conducted by Special Agent Martin Trevino, during which Trevino made clear that he did not have legal status and filled in a blank Power of Attorney form without a notary present. Merino was also present for the comments of Evelyn Rivera Borrero concerning the reason why illegal aliens paid for the conspiracy's services. Merino was similarly present during a conversation between Duran, Evelyn Rivera Borrero, and Agent Martin Trevino in which Duran explained that everything would subsequently be sent by mail. Numerous documents related to the conspiracy were also discovered during a search of Merino's residence in May 2011 and there were numerous references to Merino on documents recovered in the 2009 and 2011 searches of other locations associated with the conspiracy. Merino not only knew of the conspiracy and joined it with the intent to further its purpose, but his involvement was on par with the average member of the conspiracy.

Even if Merino was not an autonomous decision-maker, he was still entrusted with significant administrative duties and he clearly knew what Duran was promising his customers

and had a very good idea of what customers were getting and the process used. Merino is not being unfairly punished for conduct that was unforeseeable to him based on his role in the conspiracy. He did not, however, play a leading or supervisory role in this offense, and therefore his adjusted offense level is 33. The Court will determine whether an enhancement applies for obstruction of justice at the time of sentencing.

       iv.     *Yalitza Exclusa Borrero*

The base offense level is 7. Based on Exclusa Borrero's testimony at trial, she began working for Duran sometime after she met him in August 2011 but before she married him in November 2011. Beyond that, the only other information regarding the beginning of her involvement is that her sister, whom she recruited into the conspiracy, began working for Duran at the end of October or beginning of November. Without additional evidence, the Court will conservatively determine that Exclusa Borrero did not join the conspiracy long before her sister. From late October to late June is 8 months, inclusive, which results in a total of 480 victims and a total loss of $168,000, and increases of 10 levels under subsection (b)(1) and 6 levels under (b)(2). The same 6 levels are added as discussed above, for an adjusted offense level of 29.

Defense counsel argues, apparently for the first time in his most recent memorandum, that Ms. Exclusa Borrero should receive a two-level reduction under § 3B1.2(b) because she was a minor participant. The Court disagrees. Again, application Note 3 to § 3B1.2 explains that the guideline applies to a defendant who is "substantially less culpable than the average participant." Further, the determination is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case. U.S.S.G. § 3B1.2, application note 3(C). Ms. Exclusa Borrero was involved in all facets of the offense, had the average participant's knowledge of the scope of the scheme, and is not entitled to any reduction

for playing a mitigating role.

Specifically, the evidence at trial showed that Yalitza Exclusa Borrero was involved with both the customer intake stage of the conspiracy and the actual delivery and processing of application paperwork at the BMV multiple times per week. She was present when undercover Officer Neuman identified herself as an alien and signed a blank Power of Attorney form without a notary present—and Yalitza Exclusa Borrero was often charged with the responsibility of taking the blank POA's to the notary for signature. Testimony of BMV representatives showed that Ms. Exclusa Borrero was one of the conspiracy's two primary agents (along with Evelyn Rivera Borrero) who delivered the application and title paperwork to BMV branch locations, and conducted the maximum allowable ten transactions each time. When Yalitza Exclusa Borrero left the BMV, she had with her title paperwork and temporary paper license plates, knowing the BMV would later mail the permanent plates and registrations directly to the customers. There is sufficient evidence to show that Yalitza Exclusa Borrero knew that at least some of the conspiracy's customers were illegal aliens who could not obtain license plates, titles, or registrations and knew that material misrepresentations were made to obtain these items. These facts establish her knowledge of and membership in the conspiracy, as well as her role in it which made her no less culpable than the other average participants. Although the relatively short time she was involved in the offense is reflected in her lower loss amount, it is not determinative on the issue here given her involvement was essential to the success and scope of the conspiracy. *See United States v. Gallardo*, 497 F.3d 727, 741 (7th Cir. 2007) (finding that the district court explicitly considered the length of the defendant's involvement, but nonetheless found that his role was essential to the success and scope of the conspiracy). Here, Ms. Exclusa Borrero was not "substantially less culpable than the average participant", even considering the

abbreviated time frame that she was involved. The Court will determine the application of obstruction of justice at the time of sentencing.

v.      *Evelyn Rivera Borrero*

The same guidelines calculation applies to Rivera Borrero as Exclusa Borrero, resulting in an adjusted offense level of 29. Neither the government nor the PSR suggest that an obstruction of justice enhancement is appropriate for her, however, so her total offense level will also be 29.

SO ORDERED.

ENTERED:   October 2, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court